PER CURIAM.
This case is before the Court on appeal to review the convictions of Miguel Oyóla for the first-degree murder of Michael Lee Gerrard, false imprisonment as a lesser included offense of kidnapping, armed robbery with a deadly weapon, and grand theft of a motor vehicle. A jury recommended a sentence of death by a nine-to-three vote. The trial court accepted that recommendation and sentenced Oyóla to death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
FACTS

Evidence Supporting Murder Conviction

Gerrard owned and operated C & G Outdoor Services, which was an outdoor landscaping business in and around Leon County, Florida. Gerrard employed Oyóla in his landscaping business. Wakulla Bank had a long-standing business relationship with Gerrard and Gerrard’s company, and had issued Gerrard a debit card for his C & G Outdoor Services business account. On the day of the murder, a bank employee at Wakulla Bank, who had a long-term professional relationship with Gerrard and his business, received a telephone call from Gerrard. He inquired as to suspicious activities on his business debit card. She examined the account’s banking data and informed Gerrard of a series of suspicious transactions that had occurred the day before. Gerrard was both surprised and angered with regard to the transactions. He advised that he would travel to the bank to see her, but Gerrard never arrived.
The suspicious transactions recorded on the debit card included numerous purchases at two different Wal-Mart stores in Tallahassee, Florida, totaling approximately $900. There was also an additional cash withdrawal of $900 on the day of Gerrard’s murder. Wal-Mart’s video surveillance cameras recorded the transactions. The police obtained still shots of the Wal-Mart transactions in question. The still shots depicted the register during the purchase and the purchaser as he left the store. The pictures depict a man who appears to be Oyóla. Also obtained with the still shots were receipts of the transactions. Oyóla signed the receipts for two of the transactions.
During the late morning on the day of Gerrard’s murder, a neighbor of Oyola’s saw Gerrard arrive at Oyola’s home in a white truck. Gerrard stepped out of the truck and talked with Oyóla for about twenty-five minutes. The two men entered the truck and drove away. At about 2:30 p.m., Gerrard was seen with one of his employees at a Sports Authority store in his white truck with an attached white trailer.
Later that afternoon, a truck driver for a logging company was driving equipment out of the woods on a logging road in a wooded area in Jefferson County, Florida. He proceeded around a curve in the road, at which point he noticed a white truck with an attached white trailer parked in the road. The trailer started to rock and two men fell out. The men were engaged in a struggle.
The struggle became more physical and the truck driver described both of the men’s shirts as having turned red. It appeared to the truck driver as though the men were fighting to the death. At this point, the driver backed his truck around the curve and used his Citizens’ Band radio to call to a work crew for help. He informed them that two men were fighting in the middle of the road. The work crew *436 joined the truck driver ten to fifteen minutes later. They proceeded around the curve and to the location of the tussle. The truck and its attached trailer, as well as one of the men, were gone. The other man was on the side of the road. He was on his hands and knees and was gasping for breath. He fell face down and remained still. The driver and work crew placed a call to the 911 emergency number.
The police dispatcher received the 911 call at 3:06 p.m. A Jefferson County deputy sheriff responded. When the deputy arrived, he found a man lying face down on the side of the road. The deputy found that the man was deceased and later identified him as Gerrard. Gerrard was also later identified as the owner of the white truck and attached trailer that was previously in the logging road before the work crew found him.
In the early evening of that same day, Oyola’s live-in girlfriend arrived home to find a white truck parked across the street. When she proceeded into her home, she found Oyóla in a bathtub bathing in bleach. She found this especially peculiar because she knew that Oyóla did not like the smell of bleach and it made him sick. She also noticed a black plastic trash bag. Although she did not completely open the trash bag, she could see that the bag appeared to contain a pair of Oyola’s beige colored pants. This seemed odd to her and she asked Oyóla whether those were his pants in the bag. He informed her that she did not want to know what was inside the bag, because if she did know, it would make her ill.
A few minutes later, Oyóla dressed and left the home, driving away in his girlfriend’s automobile. Sometime after he left, Oyóla called her and instructed her to proceed to the end of the road to pick up her car. He also told her that he was going to meet some friends and that he would call her later for a ride. She walked down to the road and found her car in the same place where the white truck had been previously parked. The white truck was no longer in the neighborhood.
Approximately one hour later, Oyóla called his girlfriend and instructed her to pick him up at a K-Mart on Blairstone Road, across the street from an old Em-barq office building. When she arrived at that location, he was wearing a jacket. He was not wearing a jacket when he left their home earlier. She had never seen that jacket before, and after that evening, she never saw the jacket again.
Later that evening, Oyóla received a call from some of Gerrard’s workers requesting a ride home because Gerrard had not responded to their calls for transportation. Oyóla responded to the workers in his girlfriend’s car. When one of the workers entered the car, he noticed a jacket that he had left in Gerrard’s white truck earlier that day. Over the objections of Oyóla, the worker recovered his jacket.
During that same evening, a witness spotted Gerrard’s white trailer on the side of a road in Leon County. The trailer was not attached to anything and the ground around the trailer was on fire. The witness stopped and tried to extinguish the fire. There was an odor of gasoline around the trailer and an empty gasoline can at the scene. The witness noticed that the trailer door was open. He saw what appeared to be blood on the door and inside the trailer. The witness notified law enforcement, who responded and searched the trailer.
There was evidence of a fire on the ground near the trailer and on the interior and exterior of the trailer door. The door of the trailer appeared to have been broken or busted open from the inside. *437 There were multiple breaks on the inside paneling of the door indicating that someone, or something, had struck blows against the door in an attempt to force the door open from the inside. There was a line of blood and dripping patterns of blood visible on the bottom of the interior side of the door. The bloodstain pattern indicated that blood had sprayed out and projected onto the interior surface of the trailer. There was also a stain pattern on the inside of a broken section of the door that was consistent with a bloody substance having been pushed or shoved into the door after the door had been broken. There were also bloodstains that appeared at the top of the inside wall of the trailer traveling away from the door and toward the rear of the trailer, consistent with cast off blood, i.e., blood that was thrown off something and onto the wall.
A large concentration of transfer blood was found on the interior of the door frame and something that was soaked with blood had come into contact with the surface. This stain was about shoulder height and consistent with someone wearing a blood-soaked garment leaning against the wall in an attempt to force the door open. There were bloodstained finger marks on the interior of the door which also indicated that someone had tried to force the door open. In addition, law enforcement found aspirated blood at floor level near the door, which was indicative of a person lying injured near the doorway while breathing for a period of time. There were also mist-like blood patterns inside the trailer, which were indicative of blood having been forced from a human body.
In the late evening on the day of the murder, Deputy Sally Cole of the Jefferson County Sheriffs Office traveled to Oyola’s residence to question him about Gerrard’s death. Oyóla voluntarily accompanied Cole to the Sheriffs Office. Law enforcement interviewed Oyóla at the Sheriffs Office for informational purposes. He claimed he remained home all day until other workers called him for transportation because Gerrard had not responded to their calls and they needed a ride home. He claimed to have made several phone calls to Gerrard throughout the day and to have exchanged voicemail messages with him. He informed law enforcement that he suspected that two other men had committed the crime. He also said that Gerrard directed him to use the business debit card for up to $1500 worth of purchases for Christmas gifts.
Upon searching the area around Oyola’s residence, Cole located both the lower and upper halves of Gerrard’s cellular phone (the phone had been broken in two) in the woods one-tenth of a mile from Oyola’s residence. Officers later located a car floor mat near that area. The floor mat was consistent with the type of floor mat that was later found missing from the driver’s side of Gerrard’s truck. Law enforcement officers also searched the girlfriend’s car and found approximately $700 cash in the glove compartment. Oyóla claimed that he told her that he placed the money in the glove compartment. He did not tell his girlfriend the source of the money, but informed her that it was money “owed to him.”
The day after the murder, law enforcement located Gerrard’s truck in Tallahassee, Florida. The interior of the truck was searched for fibers, fingerprints, and bloodstains. Reddish-brown stains were found inside the truck that tested positive for blood. There was a floor mat on the passenger’s side, but no floor mat on the driver’s side. A shovel and a gas can filled with fuel were found in the bed of the truck along with a reddish-brown substance that tested positive for blood. The shovel was bent and curved on its right. *438 A substance that tested positive for blood was found on the end of the shovel.
After Gerrard’s death, Kevin Dunn, a friend of the Gerrard family, helped maintain Gerrard’s business. Dunn spoke with Oyóla because Oyóla was a key person in the daily operations of the business. Dunn did not feel entirely comfortable conversing with Oyóla because there was speculation about Oyola’s involvement in the murder of Gerrard. While Dunn, Oyóla, and another individual had a drink in Gerrard’s honor, Dunn said that Oyóla kept trying to proclaim his innocence. Oyóla stated that it was odd for Gerrard to have been on the logging road because Gerrard always had his cellular phone with him and there is no cellular signal on that road. Oyóla said that he had not seen Gerrard on the day of the murder but that Gerrard had driven to Oyola’s house to deliver money to him. The dollar amount Gerrard delivered to Oyóla changed as the conversation progressed: First, Oyóla claimed that Gerrard placed $800 in his mailbox; then he claimed that the amount was $600; and later he changed the amount to $500. Oyóla claimed that, other than Gerrard leaving money in his mailbox, he had not been in contact with Gerrard that day.
In November 2008, after his arrest for murder, Oyóla spoke with his cellmate, James Hendrith, about the murder of Ger-rard. According to Hendrith, Oyóla bragged to him that he had robbed and killed Gerrard. Oyóla allegedly stated that he stabbed Gerrard and hit Gerrard with a shovel multiple times. He said that he stole Gerrard’s white truck and $875. He claimed that he used a knife during the murder, cleaned it after the murder, and subsequently disposed of the knife. Oyóla also told Hendrith that he burned his bloody clothes. He informed Hendrith that he planned to plead insanity, and perhaps self-defense, on the basis that a truck driver saw him and Gerrard fighting, but did not actually see Oyóla kill Gerrard. To Hendrith, Oyóla did not appear “crazy”; to the contrary, he seemed very alert.

Gerrard’s Injuries

Gerrard had been struck at least four times in the head, causing injuries and bleeding into his brain. There was also a laceration above his right eyebrow; scrape abrasions on his right cheek; and an injury that sliced through his right ear. The injury to Gerrard’s right eyebrow appeared to have been caused by a blunt object that had a sharp edge, consistent with the edge of a shovel. This injury was also consistent with multiple strikes to that area.
Gerrard had also sustained eight stab wounds. One of the eight stab wounds was on the top of his right shoulder and two were to the right upper arm, proceeding through the soft tissue of the arm and into the soft tissue of the chest. The depth of some of his arm injuries was consistent with an attempt by Gerrard to interpose his arm between his body and a blade. Gerrard’s torso had sustained four separate stab wounds. One of these wounds penetrated his abdomen and incised his right kidney. The nature of the wounds indicated that the blade used was sharp on one side and blunt on the other.
Gerrard also suffered several injuries consistent with defensive wounds. More specifically, there were superficial linear scrape wounds on his upper abdomen; linear, incised injuries on his left and right hands; and abrasions on top of his right hand. On the palm of Gerrard’s right hand near the base of the thumb were slice-type injuries and there were abrasions on his right wrist.
It appeared as though the wounds occurred at approximately the same time. The relative proximity of the stab wounds indicated that the victim was moving very *439 little when they were inflicted and that he could have been lying on the ground. The impacts to Gerrard’s head were sufficient to cause unconsciousness and, along with the stab wounds, were ultimately determined to be fatal. The authorities were unable to determine when in the sequence of events Gerrard lost consciousness. However, because of the defensive wounds on his hands and forearms, the medical examiner believed that he was conscious and resisting for part of the attack.

Guilty Verdict

On a general verdict form, the jury found Oyóla guilty of the first-degree murder of Gerrard, false imprisonment as a lesser included offense of kidnapping, armed robbery with a deadly weapon, and grand theft of a motor vehicle.

Penalty Phase

At the beginning of the penalty phase, Gerrard’s mother, sister, and wife read victim impact statements. In those statements, they expressed sorrow for their loss, but requested that the trial court not sentence Oyóla to death and, instead, give him a sentence of life imprisonment without parole.
The defense then submitted the testimony of Manuel Oyóla, the brother of Oyóla. Manuel is nine years older than Oyóla, and he remembered Oyóla at a young age while Oyóla was living with their parents in Connecticut. Manuel claimed that their parents physically abused Oyóla, hitting Oyóla and his siblings with belts, broomsticks, and pointed shoes. According to Manuel, this type of physical abuse occurred often and was so rampant that it caused Manuel, Oyóla, and their siblings to leave home around the age of fifteen.
Miguel believed that their abusive home life affected Oyola’s intellectual development during childhood by hindering Oyo-la’s study habits. According to Miguel, the abuse also affected the way Oyóla handled stress and emotional situations, heightening his temper. Miguel also testified that Oyóla began using drugs when he was approximately twelve years old.
The defense also submitted the testimony of Dr. Michael Thomas D’Errico, PhD, a forensic psychologist, who had performed two court-ordered psychological evaluations of Oyóla. The first evaluation was after the murder, on March 4, 2008, and concerned Oyola’s legal competency relative to his ability to stand for a violation of probation hearing.[1] During the evaluation, D’Errico examined Oyola’s prison mental health records. The psychiatrist at the prison assigned Oyóla a working diagnosis of schizophrenia/paranoid type, which is a form of psychosis that involves hallucinations and delusions. The prison psychiatrist noted that he was treating Oyóla for this psychosis with an antipsychotic medication. D’Errico found that Oyóla exhibited several symptoms of the psychotic condition, i.e., he experienced auditory hallucinations, such as voices telling him negative things about himself and encouraging him to hurt himself, as well as visual and olfactory hallucinations.
D’Errico then noted Oyola’s social history and measured Oyola’s long-term memory. D’Errico found that Oyóla had a family history of mental illness. In particular, Oyola’s mother had been treated for schizophrenia and bipolar disorder, and one of his brothers suffered from schizophrenia. D’Errico also examined Oyola’s school records from the Hartford Public School System Special Education Depart *440 ment in Connecticut. According to D’Er-rico, the records were not detailed, but they confirmed that during primary grades, Oyóla was enrolled in special education classes. In addition, according to Oyola’s standardized achievement tests, his overall reading and math ability scores were no higher than the seventh percentile.
D’Errico found that Oyóla had a substance abuse problem (cocaine abuse). After he examined Oyola’s records from the Philadelphia Correctional Center (Oyóla had previously lived in Philadelphia, Pennsylvania, during which time he was convicted of robbery and possession of cocaine), D’Errico learned that, in addition to cocaine, Oyóla abused heroin and PCP. The psychiatric documentation in those records reflected treatment for a working diagnosis of schizoaffective disorder. Oyó-la had been placed on the psychotropic medication Zoloft, an antidepressant, and Risperdal, an antipsychotic medication. The records noted that the psychotropic medications alleviated the symptoms of the schizoaffective disorder, in that they suppressed his hallucinations, paranoid delusions, feelings of depression, difficulty modulating emotions, and unjustified anger and nervousness.
After the first evaluation, D’Errico concluded that Oyóla was not legally competent to stand for his violation of probation hearing and recommended inpatient mental health treatment. D’Errico was also concerned with Oyola’s physical health. Oyóla was an insulin-dependent diabetic and, due to his delusions, he refused his insulin shots because he believed that the shots were an attempt to inject him with poison. Due to his refusal to inject his insulin, his blood sugar level was three times higher than'medically recommended.
In June 2010, D’Errico conducted his second psychological examination of Oyóla. The purpose of the second evaluation was to determine Oyola’s level of psychological stability, to make a determination of his competency to proceed to trial for the murder of Gerrard, to assess his sanity at the time of the offense, and to determine the presence or absence of certain mitigating circumstances in his case. D’Errico found that Oyola’s mental status had improved since the March 2008 evaluation. In particular, D’Errico found that Oyóla was alert and aware of place, time, and date, and displayed no expression of suicidal ideations. Oyóla stated that he was involved in treatment for his hallucinations and was again receiving Risperdal and Zoloft (later changed to Wellbutrin) for his mental health issues.
D’Errico then conducted a psychometric analysis of Oyola’s mental condition. This testing revealed a full-scale IQ score of seventy-four, which falls in the borderline range of intellectual functioning (100 demonstrates average intelligence). D’Errico concluded that Oyóla had suffered a head injury in the past, but he found no evidence of brain damage. D’Errico noted that Oyóla had a fair amount of memory capacity and demonstrated the ability to learn as stimuli were provided to him.
Based on this second evaluation, D’Erri-co found that Oyóla was legally competent and was able to proceed to trial for the murder of Gerrard. He also determined that at the time of the offense Oyóla was generally mentally aware of his actions and the ramifications of those actions. D’Errico found it very significant that when the crime occurred, Oyóla was not undergoing treatment nor was he on any medication. D’Errico hypothesized that if someone with mental health problems like Oyóla went without medication and treatment, his or her mental health symptoms would return.
*441 During the evaluation, Oyóla provided D’Errico with his account of Gerrard’s murder. Oyóla stated that he was aware of his behavior and what was occurring as it happened. According to Oyóla, Gerrard picked him up in the truck and accused Oyóla of having an affair with his wife. Oyóla denied this claim and subsequently told Gerrard that he needed to pay his workers because they had not received all of their money. At that point, Gerrard allegedly punched Oyóla in the face, stopped the truck, stepped out, proceeded to the back of the truck, and pulled out a knife. Gerrard then attacked Oyóla, who defended himself by punching Gerrard, throwing him to the ground, and biting his ear. When Oyóla bit Gerrard’s ear, Ger-rard released the knife. Oyóla then claimed that he secured the knife and stabbed Gerrard multiple times. After-wards, Oyóla stated that he drove away in the truck, at which point Oyóla stated that he could see Gerrard standing with the knife.
D’Errico believed it was likely that during the murder Oyóla experienced untreated symptoms of schizoaffective disorder, especially because he was not medicated at that time. In addition to auditory hallucinations and paranoia, D’Errico stated that Oyola’s mental health condition caused him to experience poor impulse and behavioral control. He hypothesized that Oyola’s condition worsened the situation with Ger-rard. He believed that, due to this paranoia, Oyóla might have overreacted and continued stabbing Gerrard after he bit Gerrard’s ear, even though any threat to Oyóla was neutralized when Gerrard dropped the knife. D’Errico also believed that Oyola’s paranoia might have led him to believe that the situation with Gerrard was potentially more dangerous than it was in reality. More specifically, Oyóla may have misinterpreted an angry, verbally aggressive Gerrard as posing a physical and life-threatening danger when none actually existed. Regardless, D’Errico opined that Oyóla understood the criminality of his conduct. However, he believed that because Oyóla was not receiving treatment for his schizoaffective disorder at the time of the murder, his mental condition interfered with his capacity to conform his conduct to the requirements of law.
During cross-examination, D’Errico testified that, based on Oyola’s IQ, Oyóla was intelligent enough to plan the destruction of the evidence, which included attempting to burn the trailer and breaking Gerrard’s cellular phone and throwing it into the woods. D’Errico also observed that Oyóla was intelligent enough to know to bathe in bleach to remove Gerrard’s blood and DNA from his body. D’Errico admitted that Oyola’s story had inconsistencies with the evidence presented because Oyóla never admitted that he hit Gerrard with a shovel (or another object), he only stated that he stabbed Gerrard; he never mentioned that Gerrard attempted to resist the stabbing (which would have been consistent with Gerrard’s defensive injuries); he never admitted that he incapacitated Ger-rard; he never admitted that he held Ger-rard captive in a trailer; and he never admitted to stealing cash from Gerrard. Nevertheless, D’Errico testified during redirect examination that it is not atypical for an individual with Oyola’s condition to be incomplete and inaccurate in a description of an incident. He also testified that, notwithstanding that Oyóla was not completely forthright, his opinion did not change with regard to Oyola’s mental state at the time the offense occurred. He stated that it was entirely possible for Oyóla, due to his mental illness, to translate a verbal confrontation between an employer and employee over stolen money into a dangerous and life-threatening situation.

*442
Sentence

In a nine-to-three vote, the jury recommended a sentence of death. During the Spencer[2], hearing, Oyóla addressed the trial court, apologized for his actions, and expressed remorse for the murder.
In the sentencing order, the trial court found the following aggravating circumstances and gave each of them great weight: (1) the capital felony was committed by a person previously convicted of a felony and on community control or felony probation; (2) the capital felony was committed while the defendant was engaged in the commission of or an attempt to commit a robbery, and the capital felony was committed for financial gain (the trial court found that these two aggravators related to a single aspect of the case, and merged them and treated them as a single aggra-vator); and (3) the capital felony was especially heinous, atrocious, or cruel (HAC).
The trial court found that the defense failed to prove the existence of any statutory mitigating circumstances. More specifically, the trial court concluded that the defense failed to establish the mitigator provided in section 921.141(6)(f), Florida Statutes (2007), which is that the defendant suffered from a mental illness that substantially impaired his ability to conform his conduct to the requirements of law. In its analysis section devoted to statutory mitigation, the trial court noted that Oyola’s history of mental illness, although insufficient to establish the statutory mitigator, was given slight weight in the trial court’s consideration of aggravating and mitigating circumstances. Then, in the section of the sentencing order devoted to nonstatutory mitigating circumstances, the trial court gave slight weight to “non-statutory mitigation [that] included serious drug abuse, an abusive home life as a child [that] created a cycle of violence, and mental disorder.”
The trial court concluded that the aggravating circumstances in this case far outweighed the mitigating circumstances. The trial court agreed with the jury’s recommendation and imposed a sentence of death upon Oyóla for the first-degree murder of Gerrard. For Oyola’s false imprisonment conviction, the trial court sentenced him to five years’ imprisonment; for the conviction of armed robbery with a deadly weapon, the trial court sentenced Oyóla to life imprisonment; and for the conviction of grant theft of a motor vehicle, the trial court sentenced him to five years’ imprisonment.
This appeal followed.
ANALYSIS
On appeal, Oyóla contends that the trial court erred: (1) when it assigned great weight to the HAC aggravating circumstance; (2) when it rejected the statutory mitigator that Oyola’s mental condition at the time of the murder substantially impaired his ability to conform his conduct to the requirements of law; and (3) when it treated Oyola’s mental state as a nonstatu-tory mitigator and assigned it slight weight. He also challenges: (4) the trial court’s analysis and evaluation of the mitigating circumstances, as provided in the sentencing order on the basis that it does not meet the requirements of Campbell v. State, 571 So.2d 415 (Fla.1990); and (5) whether Florida’s capital punishment scheme is unconstitutional in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We affirm the findings and underlying judgment of guilty in the trial court, but reverse and remand for the limited purpose of requiring the trial court to perform a new sentencing *443 evaluation because the analysis of the mitigating circumstances in the trial court’s sentencing order does not meet the requirements articulated in Campbell

HAC Aggravator

To determine whether the trial court properly found an aggravating factor, this Court reviews the record to consider whether the trial court applied the correct rule of law. See Hernandez v. State, 4 So.3d 642, 667 (Fla.2009). If the trial court has applied the correct rule of law, this Court will affirm the finding of that aggravating factor if the trial court has supported that finding -with competent, substantial evidence. See id. “The weight to be given aggravating factors is within the discretion of the trial court and is subject to the abuse of discretion standard.” Carter v. State, 980 So.2d 473, 483 (Fla.2008). A trial court abuses its discretion “when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.” Huff v. State, 569 So.2d 1247, 1249 (Fla.1990) (quoting Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)).
This Court has explained what constitutes the HAC aggravator:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Hernandez, 4 So.3d at 668-69 (quoting State v. Dixon, 283 So.2d 1, 9 (Fla.1973)).
Unlike the cold, calculated, and premeditated aggravator, whose primary focus is on the intent, motivation, and state of mind of the defendant, the HAC aggra-vator focuses on the means and manner a defendant has used to inflict death, as well as the immediate circumstances that surround the death from the perspective of the victim. See id. at 669. In evaluating whether HAC is present, a trial court focuses on the victim’s perception of the circumstances — not the perpetrator’s viewpoint. See id. As a trial court considers the mental state of a victim, it may make common-sense inferences from the circumstances. See id. The evidence presented must establish that the victim was conscious and aware of his or her impending death. See id. For example, defensive wounds on a victim evidence awareness of impending death. See Guardado v. State, 965 So.2d 108, 116 (Fla.2007). In addition, the fear, emotional strain, and terror of the victim during the events leading up to a murder may render the murder especially heinous, atrocious, or cruel. See Hernandez, 4 So.3d at 669.
Oyóla contends that the trial court abused its discretion when it assigned great weight to the HAC aggravator because the trial court failed to account for his mental health status. However, as previously noted, the focus of this Court when reviewing a trial court’s finding of the HAC aggravator is from the perspective of the victim — not the viewpoint of the defendant. Thus, Oyola’s mental health does not factor into an assignment of weight to the HAC aggravator; rather, it is a possible mitigator that a trial court may weigh against the HAC aggravator when determining a sentence. See § 921.141(6)(b), (e), (h), Fla. Stat. (2007).
*444 Oyóla further contends that the evidence does not establish that the trial court should have given the HAC aggravator great weight because it illustrates only one confrontation at one location between Oyóla and Gerrard. However, the trial court did not abuse its discretion in assigning the HAC aggravator great weight because, given the evidence, a reasonable person could have taken the position adopted by the trial court, and the number of locations is not the sole measure of the HAC analysis. In particular, the evidence supports an inference that Gerrard was attacked in two locations and transported to the logging road for disposal because the bloodstained trailer interior reflected a dire struggle and the bloodstained damage to the interior door evidenced an attempt to escape from the trailer. This permitted a reasonable inference that Gerrard was locked in the trailer in a bloody, beaten condition, and, while fearing for his life, attempted to escape during transport to the logging road, which, as evidenced by the truck driver’s testimony, was where the final confrontation between Gerrard and Oyóla occurred.
The testimony of the truck driver also established that Oyóla and Gerrard were engaged in a vicious fight to the death. The truck driver described them as tumbling and tussling with red-stained shirts. This suggests a protracted struggle between Gerrard and Oyóla during which Gerrard likely feared for his life. Further, Gerrard’s awareness of his impending death flows from the evidence that when the work crew found him, Gerrard was gasping for breath immediately before he fell to the ground and died. This established that Gerrard likely knew of his impending death and he continued to struggle for life immediately before he died.
In addition, Gerrard’s wounds reflected the heinous nature of his murder. Ger-rard was attacked with two different weapons: a sharp knife-like object and a blunt object consistent with a shovel. He incurred multiple stab wounds, with one stab wound to his arm indicative of the blade entering one side of his arm and exiting on the opposing side, along with four more stab wounds to his abdomen, one of which incised his right kidney. Some of his arm wounds reflected a defensive posture by Gerrard, illustrating that he attempted to interpose his arm between his body and a blade. Gerrard also suffered defensive wounds to his hands, wrists, and abdomen. It is likely that Gerrard experienced terror and inexorable fear while he defended against the wounds inflicted upon him.
Gerrard also suffered multiple and severe impacts to his head that caused bleeding inside his brain. It is logical to infer that, before he lost consciousness, Gerrard feared for his life as he was struck in the head multiple times. Although the medical examiner could not definitively determine whether Gerrard lost consciousness before or after the stab wounds, thus calling into question which occurred first, she did testify that the wounds to his hands and forearms were indicative of a conscious resistance during the attack.
Accordingly, the evidence presented reasonably leads to the conclusion adopted by the trial court — that this crime warranted the assignment of great weight to the HAC aggravator.

Mental Health Mitigators

A trial court must expressly evaluate all statutory and nonstatutory mitigators a defendant has proposed. See Ault v. State, 53 So.3d 175, 186 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011). A trial court must find a proposed mitigating circumstance when the defendant has established that mitigator through competent, substantial evidence. See Reynolds v. State, *445 934 So.2d 1128, 1159 (Fla.2006). However, a trial court may reject a mitigator if the defendant fails to prove the mitigating circumstance, or if the record contains competent, substantial evidence supporting that rejection. See Ault> 58 So.3d at 186. “Even expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case.” Id. (quoting Coday v. State, 946 So.2d 988, 1003 (Fla.2006)). A mitigator may also be rejected if the testimony supporting it is not substantiated by the actions of the defendant, or if the testimony supporting it conflicts with other evidence. See Douglas v. State, 878 So.2d 1246, 1257 (Fla.2004) (holding that although testimony supported a mitigator, the trial court did not err by not finding it because the actions of the defendant did not substantiate that testimony); see also Coday, 946 So.2d at 1005 (“The expert testimony from the defense could be rejected only if it did not square with other evidence in the case”).
The weight a trial court assigns to a mitigator is within its discretion and will not be disturbed on appeal absent an abuse of that discretion. See Douglas, 878 So.2d at 1257. Upon finding a mitigating factor, a trial court may assign it little to no weight when the effect of that circumstance has no or only a slight mitigating effect given the unique facts of the case. See id.
The statutory mitigator at issue is found in section 921.141(6)(f), Florida Statutes (2007), which states, “The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.” The nonstatutory mitigators at issue to which the trial court assigned slight weight were related to the mental illness of Oyóla (schizoaffective disorder and bipolar disorder), his family history of mental illness, and his abusive home life as a child.
In this case, the trial court properly rejected the statutory mitigator because competent, substantial evidence of record supports that rejection. During the penalty phase, the defense presented the testimony of D’Errico. After the murder of Gerrard, D’Errico conducted two psychological evaluations of Oyóla. Based on the evaluations, D’Errico concluded that, although Oyóla understood the criminality of his conduct, his ability to conform his conduct to the requirements of law was impaired due to his mental illness. D’Er-rico, however, did not find or testify that Oyola’s mental health condition substantially impaired his ability to conform his conduct to the requirements of law, as mandated in the express language of section 921.141(6)(f).
Furthermore, the evidence presented supports the rejection of the theory that Oyola’s mental condition substantially impaired his ability to conform his conduct to the requirements of law. More specifically, the evidence presented established that Oyóla understood the criminality of his conduct and was intelligent enough to destroy evidence in an attempt to exculpate himself from the murder, i.e., he burned the trailer and his clothes, broke Gerrard’s cellular phone and discarded it, and bathed in bleach to remove Gerrard’s blood and DNA from his body. D’Errico even testified that he believed that Oyóla understood the criminality of his conduct, and that, based on his intelligence assessment of Oyóla and Oyola’s IQ, Oyóla was intelligent enough to destroy the evidence. D’Errico’s testimony that Oyóla understood the criminality of his conduct supports a logical inference that in understanding the criminality of his conduct, Oyóla was able to conform it to the requirements of law. Oyóla even allegedly *446 confessed to his cellmate that he robbed and murdered Gerrard, and that he planned to plead insanity or self-defense in an attempt to exculpate himself. To his cellmate, Oyóla appeared alert and not hindered by a mental illness. Thus, given Oyola’s intelligence, ability to understand his criminal conduct, and his actions in attempting to cover up the crime, a reasonable judge could have rejected that statutory mitigator.
The trial court also did not abuse its discretion in giving the nonstatutory mitigators slight weight because, although those mitigators were established, their effect, given the facts of this case, warranted the allocation of slight weight. As shown above, although Oyóla had a history of mental illness and drug abuse, and an abusive home life as a child, he also displayed the intellectual capacity to understand the criminality of his conduct, and thus, conform it to the requirements of law. More specifically, Oyola’s behavior both before and after the murder established an intelligent thought process and a malicious intent to exculpate himself from the murder, rendering dubious the effect of the mitigating evidence given the facts of this case. Therefore, the trial court did not abuse its discretion when it assigned slight weight to the nonstatutory mitigating evidence.

Campbell Violation

Pursuant to Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990), Oyóla contends that the trial court’s sentencing order discounted the record evidence with regard to the mitigating effect of his mental health without providing a basis for discounting this evidence through a proper analysis and explanation. We agree.
In Campbell, we articulated the requirements with regard to the manner in which a trial court must weigh aggravating circumstances against mitigating circumstances in its written sentencing order. See id. We provided that, when addressing mitigating circumstances, a trial court must “expressly evaluate” the mitigating circumstances that the defendant has proposed and determine whether evidence supports them. Id. at 419. In cases of nonstatutory mitigators, trial courts must determine whether those miti-gators are “truly of a mitigating nature.” Id. A trial court must then weigh the aggravating circumstances against the mitigating circumstances. See id. at 420. To enable proper appellate review, a sentencing order must expressly consider each proposed mitigating circumstance, determine if the circumstance exists, and, if the circumstance does exist, what weight to allocate it. See id. For this Court to sustain a trial court’s final decision in its sentencing order, competent, substantial evidence of record must support the trial court’s weighing process. See id. at 419-20. Moreover, the trial court’s sentencing order must reflect “reasoned judgment” by the trial court as it weighed the aggravating and mitigating circumstances. See Lucas v. State, 568 So.2d 18, 20 (Fla.1990).
In this case, the trial court found that the defense failed to prove the existence of any statutory mitigating circumstances. More specifically, the trial court concluded that the defense failed to establish the statutory mitigator provided in section 921.141(6)(f), which is that the defendant’s ability to conform his conduct to the requirements of law was substantially impaired. In its analysis titled “Statutory Mitigating Circumstances,” the trial court, in denying the capacity-to-conform statutory mitigator, provided the following:
[Oyóla] contends that he suffers from a mental illness impairing his ability to conform his conduct to the requirements *447 of law. He also contends that he was raised in an abusive home, which mitigates against the imposition of the death penalty. The evidence did establish that the defendant suffered from Schizoaffec-tive Disorder, Bipolar type, and that there was a history of mental illness in his family, but the evidence was insufficient to show that such mental condition impaired his ability to conform his conduct to the requirements of law. These circumstances were only given slight weight in weighing the aggravating circumstances against the mitigating circumstances, but they were considered by the Court.
Then, in the section of the trial court’s sentencing order entitled “Non-Statutory Mitigating Circumstances,” the trial court provided the following:
The alleged non-statutory mitigation included serious drug abuse, an abusive home life as a child, created a cycle of violence, and mental disorder. While the evidence did establish such circumstances, the Court only gives such circumstances slight weight in weighing the aggravating circumstances against the mitigating circumstances.
As shown in the quoted language, the sentencing order violated the requirements articulated in Campbell because the trial court did not expressly evaluate, in a well-reasoned fashion, how the evidence presented failed to support the mitigating evidence presented by Oyóla. Rather, it merely gave a brief summary of its findings with regard to the mitigators, and did not expressly and specifically articulate why the evidence presented failed to support the proposed statutory mitigators, and why that same evidence warranted the allocation of slight weight to the nonstatu-tory mitigation evidence presented. In Tact, the trial court’s evaluation of the established nonstatutory mitigation evidence grouped three separate nonstatutory miti-gators into a single sentence, and, in a single subsequent sentence, summarily gave them slight weight. In accordance with Campbell, the trial court should have separated and evaluated each nonstatutory mitigator, providing an evaluation and analysis as to why it gave each of them slight weight. In addition, the trial court’s misplaced and confusing reference to what appears to be a finding with regard to nonstatutory mitigation inside the statutory mitigation section of the sentencing order further compounds its failure to render a sentencing order that reflects a well-reasoned evaluation and determination.
Therefore, we conclude that the sentencing order fails to meet the requirements of Campbell. We accordingly reverse and remand to the trial court for the limited purpose of properly evaluating all mitigation and aggravation and providing this Court with a revised sentencing order that contains an evaluation that complies with the requirements of Campbell.

Sufficiency of the Evidence

Although not raised by the parties, this Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a trial court imposed a sentence of death. See Blake v. State, 972 So.2d 889, 850 (Fla.2007); Fla. R.App. P. 9.142(a)(5). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)). The jury found Oyóla guilty of first-degree murder on a general verdict form. The trial court instructed the jury on both premeditated murder and felony murder with an under *448 lying felony of armed robbery with a deadly weapon, or an attempt thereof. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 73 (Fla.2004).
Sufficient evidence supports Oyo-la’s conviction for the first-degree premeditated and felony murder of Gerrard. With regard to premeditation, the State presented evidence establishing that the day before the murder, Oyóla had imper-missibly used the company credit card for his own pecuniary gain, and that Gerrard learned of the transgressions on the day of his murder. On the day of the murder, a neighbor of Oyola’s witnessed Gerrard and Oyóla walking and talking together at Oyo-la’s home, followed by them leaving together in Gerrard’s white truck. This testimony established that Gerrard and Oyóla were together the day of the murder and that Gerrard likely confronted Oyóla about his credit card transgressions. This evidence supports the reasonable inference that Oyóla, in an attempt to exculpate himself from his pecuniary crime, decided to kill Gerrard.
Gerrard’s wounds further support an inference of premeditation. They included multiple stab wounds to Gerrard’s arms and abdomen, as well as several blows to Gerrard’s head with an object having an incised edge consistent with that of a shovel. The infliction of these multiple blows and wounds established that Oyóla consciously, intentionally, and with premeditation killed Gerrard, as it reflects a period long enough for Oyóla to contemplate his actions before he carried them out.
Further support of premeditation consists of evidence illustrating that Oyóla held a bloody and beaten Gerrard captive in the trailer while Oyóla transported him to another location, inflicted additional injuries when Gerrard tried to fight back, and then abandoned Gerrard dead or dying on the side of the road. The specific evidence that supports this is the blood inside the trailer, the bloody damage on the interior door of the trailer, aspirated bloody spray on the door, and bloody fingerprints on the door. This evidence illustrates that a bloody Gerrard was alive, lying close to the door, and thereafter attempted to force the door open from the inside. Further evidence supporting premeditation is the witness testimony establishing that Oyóla transported Gerrard to a logging road, which Oyóla admitted was an abnormal place for Gerrard to be, where Oyóla continued to beat Gerrard and left him (Gerrard) for dead. During that transport time, Oyóla had an opportunity to contemplate and formulate the intent to kill Gerrard.
Oyola’s intent to kill is also illustrated by his premeditated design to cover up his crime by attempting to dispose of the evidence, i.e., leaving the truck on the side of the road, cleaning himself and disposing of the murder weapon, attempting to burn the trailer, disposing of his clothes, and admitting to his jail cellmate that he burned his clothing. Further inculpating Oyóla in the premeditated murder of Ger-rard is the missing floor mat from Ger-rard’s truck and Gerrard’s broken cellular phone found by law enforcement near Oyo-la’s home. Oyola’s live-in girlfriend also testified that she witnessed Oyóla bathing in bleach after Gerrard’s murder occurred, and that Oyóla had parked Gerrard’s truck outside their home that he later drove away and had her meet him at another location. These facts evidence a conscious intent by Oyóla to cover up the crime by disposing of the evidence.
Oyola’s confession to his cellmate pro-, vides further support for premeditation.
*449 Oyóla unremorsefully confessed to Ms cellmate that he intentionally robbed and killed Gerrard. The inmate testified that Oyóla bragged to him about how he both robbed and killed Gerrard by stabbing him several times with a knife and hitting him multiple times with a shovel, after which he stole Gerrard’s truck and $375.
The evidence presented below also supports felony murder with an underlying felony of armed robbery, as Oyóla confessed to his cellmate that he murdered Oyóla with a knife and shovel while robbing him by stealing his truck and money.
Therefore, we conclude that there is sufficient evidence supporting Oyola’s convictions.

Proportionality

Although not raised by the parties, this Court, due to the uniqueness and finality of death, has a mandatory obligation to independently review and address the proportionality of the death sentence. See Williams v. State, 37 So.3d 187, 205 (Fla.2010). In reviewing for proportionality, this Court should consider the totality of the circumstances and compare the matter with other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999). This Court will also make “a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” Williams, 37 So.3d at 205 (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)). Such a review entails a qualitative review of the underlying basis for each aggravator and mitigator; not a quantitative analysis. See id. Thus, this comparison is not between the number of aggravating and mitigating circumstances. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Rather, the death penalty is reserved only for the most aggravated and least mitigated murders. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In this case, the jury recommended the death penalty for the murder of Gerrard by a vote of nine to three. The trial court found this recommendation appropriate after weighing the statutory aggravating circumstances against the statutory and non-statutory mitigating circumstances. We are requiring the trial court to properly evaluate all mitigation and aggravation and provide this Court with a revised sentencing order which complies with Campbell. We therefore defer our proportionality analysis until we receive a final sentencing order.

Ring

Oyóla acknowledges that pursuant to this Court’s prior precedent in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), this claim does not warrant relief, but was raised for the purpose of preservation. This Court has repeatedly rejected the assertion that Ring requires aggravating circumstances be found individually by a unanimous jury. See, e.g., Frances v. State, 970 So.2d 806, 822 (Fla.2007); Hernandez-Alberto v. State, 889 So.2d 721, 733 (Fla.2004).
CONCLUSION
Based on the foregoing, we affirm the judgments of guilt. However, we reverse and remand for the limited purpose of requiring the trial court to provide this Court with a revised sentencing order that contains a sentencing evaluation in compliance with Campbell.
It is so ordered.
*450 LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., concurs in part and dissents in part, in which CANADY, J., concurs.
PARIENTE, J., concurs as to conviction and concurs in result as to sentence.

. At the time of the murder, Oyóla had been placed on probation for the crimes of grand theft of a motor vehicle and grand theft.

. Spencer v. State, 615 So.2d 688 (Fla.1993).