# Supreme Court of Florida

_____

No. SC11-1206
_____

**MARGARET A. ALLEN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[July 11, 2013]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

This case is before the Court on appeal from a judgment of convictions of first-degree murder and kidnapping and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Allen's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

On March 8, 2005, Margaret A. Allen was indicted for the first-degree murder and kidnapping of Wenda Wright. Wright's domestic partner, Johnny Dublin, last saw Wright leaving his home with Allen. Wright never returned home. A few days after Wright went missing, Quintin Allen, Margaret Allen's co-

defendant and the State's main witness turned himself in to the police and told the police about the events that led up to Wright's death. Quintin also took the police to the location in which he, Allen, and James Martin buried Wright's body.

**Guilt Phase**

A jury trial commenced on September 13, 2010. Johnny Dublin testified for the State. Dublin testified that on the day Wright went missing, Allen came to Dublin and Wright's house and whispered something into Wright's ear. In response, Wright and Allen left the house together. A little while later, Allen returned to Dublin's house and told Dublin that Wright stole about $2000 of Allen's money and Allen asked Dublin if she could search his house. Dublin obliged and Allen searched Dublin's house. Dublin testified that he noticed that Allen had scratches on her when she came back to his house. Dublin asked Allen where Wright was, and Allen responded that she was still at Allen's house. Dublin testified that the next day, Allen came back to his house and asked him where Wright was. Dublin testified that Quintin was with Allen.

Quintin Allen testified for the State. He acknowledged that he was serving a fifteen-year sentence of incarceration followed by five years' probation for his guilty plea for second-degree murder based on his involvement in Wright's murder. Quintin testified that he was at Allen's house on the day of the murder when Allen noticed that her purse was missing. Allen left her house and told

Quintin to stay with her children. Allen returned to her house with Wright and asked Quintin to come inside. Allen told Quintin that Wright must have stolen Allen's purse because Wright was the only person at Allen's house before the purse went missing. Allen and Quintin searched for the purse. Allen left the house again and told Quintin not to let Wright leave if she tried. At one point while Allen was gone, Wright tried to leave; Quintin told Wright that Allen wanted her to stay, and Wright obliged.

Upon Allen's return, Quintin plaited Allen's hair. Quintin testified that at one point Wright started crying and begged Allen to let her go home. Wright attempted to leave Allen's house and Allen hit Wright on the head; Wright fell to the ground. Quintin testified that Allen had a gun and told him that if he did not help her with Wright, she would shoot him, so Quintin held Wright down on the floor. While he held Wright down, Allen found chemicals including bleach, fingernail polish remover, rubbing alcohol and hair spritz and poured them all onto Wright's face. At one point, one of Allen's children walked into the room in which this was taking place, and Allen told the child to rip off a piece of duct tape for Allen. Allen attempted to put the duct tape over Wright's mouth, but because Wright's face was wet from the chemicals that were poured on her face, the duct tape would not stick to her skin. Allen retrieved belts from her closet and beat Wright with them. Quintin then tied Wright's feet together with one of the belts.

Quintin testified that at that point Wright was not struggling. Allen then put one of the belts around Wright's neck and pulled. At one point, Wright said, "Please, stop. Please stop. I am going to piss myself." Wright's body started shaking and after about three minutes, Wright did not move. Allen then told Quintin to get some sheets to tie Wright's hands together in case Wright woke up.

Quintin left soon after the incident. Allen called Quintin throughout the night, but he did not answer her calls. The next day, Allen found Quintin at the barbershop. Quintin testified that Allen still had the gun. Quintin got into the truck that Allen was driving; James Martin was also in the truck. Allen told Quintin that Wright was dead. Allen then told Quintin that he had to help her get rid of the body.

Allen, Quintin, and Martin drove to Lowe's to buy plywood to help move Wright's body from inside the house into the truck. They also borrowed a dolly hand truck from a local shop to help move the body. Quintin testified that upon returning to Allen's house, Wright's body had been moved from where he had last seen her and had been wrapped in Allen's carpet. They were eventually able to get Wright's body into the truck. Then, all three took shovels from Allen's mother's tool shed and drove to an area off of the highway to dump Wright's body. Quintin and Martin dug a hole while Allen stood as a lookout. They placed Wright's body in the hole, covered the hole with debris, and took the carpet with them. They

threw the carpet into a dumpster outside of a truck stop and picked up Allen's daughter from school. Quintin went to the police and turned himself in. Quintin also took the police to the place where Wright's body had been buried.

James Martin testified that he was sentenced to sixty months' incarceration for his participation in hiding Wright's body. Martin testified that on the day of the murder, he was at Allen's house helping her repair a car. Allen asked Martin to help her search for her purse, and Martin did. He testified that he left Allen's house around 10 p.m. to get a starter belt for the car. Martin finished repairing the car and asked Allen if she had any cocaine. She did not, so Martin left Allen's house, found cocaine, came back to Allen's house, and smoked it. Martin testified that when he got back from finding the cocaine, Wright was the only one at Allen's house. Martin testified that the timing of the events of the day was unclear because he had been high. Martin testified that he slept at Allen's house until the morning and got a ride from Allen when she took her children to school. At that point, Allen told Martin that she needed help. Allen and Martin went back to Allen's house, and Martin saw Wright's body. Martin testified that Allen told him, "He must have hit her too hard." Martin testified that he noticed a bandana tied around Wright's hands.

Allen told Martin that they had to bury Wright's body. Allen sent Martin to Allen's brother's house to borrow a truck. Martin testified that the truck was never

found by police.  Martin testified that the entire plan, including getting the plywood at Lowe's was Allen's idea.  Martin testified that he was the only smoker of the group, and he dumped all of the ashtrays out of the car after they buried the body.  When they got back to Allen's house, Quintin left, and Martin cleaned the nylon strap that had been used to secure the carpet around Wright's body.  Martin also washed the truck but testified that he did not know what became of the vehicle.  Martin was at Allen's house when the police came to Allen's house with a search warrant.

On cross-examination, Martin testified that it was Quintin who first told Wright that she could not leave.  Martin also testified that Quintin gave directions to bury the body.  The defense elicited that Martin told Allen's sister that Quintin "did this."  On redirect, the State elicited from Martin that he was asleep and did not see who killed Wright.

Denise Fitzgerald, a crime scene technician, testified that she exhumed Wright's body and located a cigarette butt in the vicinity.  The State and defense stipulated that the DNA found on the cigarette butt was consistent with Martin's DNA.

Dr. Sajid Qaiser, a forensic pathologist and chief medical examiner for Brevard County, testified that while he did not perform the autopsy on Wright, he

had reviewed the autopsy report. He testified that Dr. Robert Whitmore,[1] the medical examiner who had performed the autopsy on Wright was no longer the chief medical examiner. Dr. Qaiser testified that a body cannot bruise once dead and that Wright had bruising in the following places: upper and lower eye lid, front and back of her ear, left torso, all over the left side, trunk, right hand, thigh, knee, left eyebrow, forehead, upper arm and shoulder area. Additionally, Wright's chest, hands, torso, face, and lower lip had contusions. Wright's wrist showed signs of ligation, meaning her hands were tied. Wright's neck showed signs of ligation, meaning that she was either hung or something was tied tightly around her neck. Dr. Qaiser testified that his medical conclusion was that Wright's death was the result of homicidal violence, and strangulation and ligature were an important cause of death. Dr. Qaiser testified that Wright was morbidly obese, with an enlarged heart, which contributed to her death. He testified that it would take from four to six minutes of strangulation to die. He could not tell whether she was rendered unconscious during the beating.

The State rested, and the defense filed a motion for judgment of acquittal asserting that the State had not proven the underlying charge of kidnapping for felony murder. The trial court denied the motion, and the defense rested without

---

1. Dr. Whitmore was unavailable to testify at trial.

calling any witnesses. The jury found Allen guilty of first-degree murder and kidnapping.

**Penalty Phase**

The penalty phase commenced on September 22, 2010. Dr. Qaiser testified on behalf of the State. He acknowledged that he could not determine what kind of pain Wright felt before she died. Dr. Qaiser reiterated that Wright had about eight to ten bruises on her face. He also testified that someone would feel a sense of panic and pressure during strangulation.

On cross-examination by the defense, Dr. Qaiser acknowledged that he did not know whether Wright was conscious during the majority of the attack. Dr. Qaiser also testified that someone would lose consciousness after about ten to twenty seconds of strangulation and would die after about four to six minutes. After Dr. Qaiser's testimony, the State rested.

Dr. Michael Gebel, a neurological physician, testified for the defense. He testified that he had reviewed Allen's records and spoken with Allen. He determined that Allen suffered from numerous head injuries, including at least four incidents in which Allen lost consciousness. He testified that Allen's records included emergency room visits in 1995 and 1996 during which she was treated for facial and head trauma and bite wounds. He also testified that she was treated in 1989 for a drug overdose. Dr. Gebel testified that Allen had significant intracranial

injuries and was at the lower end of intellectual capacity. He testified that Allen had organic brain damage, which would destroy impulse control. He opined that this brain damage might affect her ability to appreciate the criminality of her conduct and that she would have difficulty conforming her conduct to the requirements of the law. He also testified that Allen would not be able to create a complex plan. He acknowledged that Allen was not cooperative enough for him to determine whether Allen was substantially mentally impaired, but that she had lost the ability to control her mood.

On cross-examination, the State elicited Dr. Gebel's opinion that a person with Allen's brain injuries would not be able to create and follow through with a plan such as the one Allen executed to discard Wright's body. Upon the doctor finding out the facts of this case, he stated that while that would change the severity of his diagnosis of Allen, it would not change her brain injuries.

Dr. Joseph Wu, a neuropsychiatry and brain imaging specialist, testified on behalf of the defense that he reviewed Allen's PET scan. He testified that Allen had at least ten traumatic brain injuries, mostly to the right side of her brain, resulting in asymmetrical changes, specifically in the frontal lobe. Dr. Wu testified that damage to the frontal lobe affects impulse control, judgment, and mood regulation. He also testified that her brain injuries would make it hard for Allen to conform her conduct to the requirements of society. He testified that she would

have an overreaction to slight provocation, but that Allen's injuries should not impair her planning abilities. Dr. Wu testified that Allen's ability to understand and regulate proportionate responses in a consistent manner was significantly impaired. He also testified that it would be difficult for her to consistently conform her conduct to the requirements of society.

Myrtle Hudson, Allen's aunt, testified that Allen had an unstable childhood in a violent and drug-infested neighborhood. Hudson testified that she never knew Allen to abuse drugs, but Allen drank alcohol. Hudson knew of at least two abusive relationships in which Allen was beaten to the point of unconsciousness. She also thought Allen had been sexually abused as a child.

## Spencer[2] Hearing

Myrtle Hudson testified that Allen became part of the neighborhood culture, drinking alcohol and selling drugs. Bessie Noble, an advocate for prisoners, testified that Allen had an abusive and bad life. Tara Posey, Allen's cousin, testified that Allen was a good person and friend, but she had a tough and violent life, and had a problem with alcohol. She also testified that Allen sold drugs so that she could provide for her children. April Smith, Allen's sister-in-law, testified that Allen was a good person with a hard life. Irene Posey, Allen's grandmother,

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

testified that Allen had a good childhood, living with her intermittently. She testified that Allen had been a good child and that she did not commit this crime.

Margaret Allen testified on her own behalf regarding her harsh upbringing, including selling drugs and being abused. She recounted that she suffered head injuries as a result of being beaten. She acknowledged that she had been previously charged with drug and gun possession charges. She testified that she did not kill Wright. On cross-examination, Allen admitted that she had been arrested for assault and battery and that her daughter told the police that Allen committed the instant crime.

The State elicited victim impact testimony from Dublin that Wright was a good person and that she and Allen had been good friends. Diane Baxter, Wright's sister-in-law, Maria Jackson, Wright's sister, and Ralph Baxter gave victim impact statements regarding the impact Wright's murder had on the family.

The jury recommended a sentence of death by a unanimous vote. The trial court found two aggravators: (1) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit a kidnapping (great weight); and (2) the capital felony was especially heinous, atrocious, or cruel (great weight). The trial court found no statutory mitigation and found the following nonstatutory mitigation: (1) defendant has been the victim of physical abuse and

possible sexual abuse in the past (some weight); (2) defendant has brain damage as a result of prior acts of physical abuse and the brain damage results in episodes of lack of impulse control (some weight); (3) defendant grew up in a neighborhood where there were acts of violence and illegal drugs (some weight); and (4) defendant would help other people by providing shelter, food or money (little weight). The trial court concluded that the aggravating circumstances outweighed the mitigation. Thus, the trial court imposed the sentence of death. This is Allen's direct appeal.

## ANALYSIS

Allen raises the following issues for review: (1) whether the trial court erred in excluding the testimony of State witness James Martin that former-co-defendant-turned-State-witness Quintin admitted to choking the victim to death; (2) whether the trial court erred in adjudicating Allen guilty of the kidnapping charge, and whether the trial court erred in adjudicating Allen guilty of first-degree felony murder predicated on the kidnapping charge; (3) whether reversible error occurred when the prosecutor repeatedly asked the defendant's mental health expert about the nonstatutory and highly inflammatory aggravator of future dangerousness of the defendant; and (4) various claims regarding whether Allen's death sentence is impermissibly imposed.

### Guilt Phase Claims

## I. Witness Testimony

Allen asserts that the trial court erred in excluding testimony of State witness James Martin on cross-examination by the defense that the former-co-defendant-turned-State-witness Quintin allegedly admitted choking Wright to death.   We disagree.

Martin testified regarding his knowledge of the events of the day of Wright's death; however, he testified that he was not present when Wright died.   On cross-examination, the defense attempted to elicit from Martin that while they were incarcerated together Quintin allegedly admitted to Martin that he killed Wright.   Specifically, the defense asked Martin, "Did [Quintin] ever tell you or did you ever hear him say he choked [Wright]?"   The State objected and the following colloquy was proffered:

> Q [defense]: Now, when you were in the jail, at any point in time did he ever tell you that he choked Wenda Wright?
>
> A [Martin]: No, he didn't tell me.
>
> Q: Well, did you ever hear him say that, that he choked her?
>
> A: Nope.
>
> Q: In your deposition on page 12 . . . .
> > . . . .
> > "He said he had a special hold with his leg, that he choked her."
>
> A: Yeah, but-yeah.  You didn't write everything.  I remember saying that there.  I remember saying he got a special hold that he used to choke her with.  Because he nearly choked the boy out in jail with that same hold.

Q: I am going to continue in the deposition. I asked you then, "Quintin said that," question. And you said, "Yes." "So, did you hear him say he choked her?" "Yeah. He next-he next to me, he let me read the deposition and the autopsy report." So I asked you did Quintin say that?

A: Right. In the room you asked me that and I said no.

Q: So you are disputing what the court reporter wrote down? Would you like to see it?

A: No, I don't need to see it. I know I didn't say choke hold. How can I say something if it is a lie because me and him talked like that? If me and him talked, like he didn't kill nobody and he didn't do that.

Q: All right. I am just reading the deposition. Do you agree with it or not?

A: But I didn't say that he told me.

Q: Well, again, I asked you -- and your answer at the top of page 12, line 2, "He said he had a special hold with his leg that choked her."

I said, "Quintin said that?"

And you said, "Yes."

"So, if you did hear him say he choked her?"

Answer, "Yeah."

A: No.

Q: So, now you are saying that he didn't say that?

A: No. What I am saying is he didn't tell me that he choked her. But he said-yeah, I know you said he choked people, but I didn't say nothing about he choked her. I said yeah he probably did choke her. Because how can a 140 pound woman choked a 290--

The trial court excluded the testimony.

Hearsay is defined as an out-of-court statement being offered into evidence to prove the truth of the matter asserted. See § 90.801(1)(c), Fla. Stat. (2005). "Except as provided by statute, hearsay evidence is inadmissible." § 90.802, Fla. Stat. (2005). This Court reviews " 'a trial court's decision to admit evidence under an abuse of discretion standard.' " McWatters v. State, 36 So. 3d 613, 639 (Fla. 2010) (quoting Hudson v. State, 992 So. 2d 96, 107 (Fla. 2008)). The trial court's discretion is not unfettered, but is "limited by the rules of evidence." Hudson, 992 So. 2d at 107.

Allen asserts that Quintin's alleged confession to Martin is admissible under the hearsay exception of a statement against penal interest. Section 90.804(2)(c), states:

> Statement against interest.—A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.

§ 90.804(2)(c), Fla. Stat. (2005). This exception only applies when the declarant is unavailable. See § 90.804, Fla. Stat. (2005). Quintin was available to testify, was called as a State witness, and was cross-examined by the defense, during which the defense did not ask Quintin whether he had confessed to this crime. Furthermore,

the statute specifically excludes statements tending to expose the declarant to criminal liability and offered to exculpate the accused "unless corroborating circumstances show the trustworthiness of the statement." Section 90.804(2)(c), Fla. Stat. (2005). Here, there are no corroborating circumstances to show the trustworthiness of Quintin's alleged confession.

Allen's assertion that the trial court erred in assessing Martin's credibility in determining that Quintin's alleged confession did not have sufficient circumstances of reliability to be admissible, is without merit. See Carpenter v. State, 785 So. 2d 1182, 1203 (Fla. 2001) ("The credibility of an in-court witness who is testifying with regard to an out-of-court declaration against penal interest is not a matter that the trial could should consider in determining whether to admit the testimony concerning the out-of-court statement."). The trial court did not base its ruling of the admissibility of Quintin's alleged confession on Martin's credibility, but rather, on the fact that there were no other corroborating circumstances to support the reliability of Quintin's alleged confession. Thus, the trial court did not err in this regard.

Even if the trial court's exclusion of this proffered testimony was in error, it is harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986). There is no reasonable possibility the error, if any, affected the verdict in this case. As shown above, Martin denied ever saying that Quintin

- 16 -

confessed. Martin disputed the accuracy of the deposition in which he allegedly stated that Quintin choked Wright, stating during the proffer that he instead thought Quintin probably did it but that Martin's deposition statement referred to Quintin having choked a boy in prison. Furthermore, the jury did hear testimony that Martin thought that Quintin killed Wright. Moreover, Martin testified that upon seeing Wright's body, Allen told him, "He must have hit her too hard." Thus, the testimony elicited during the proffer regarding Martin's deposition was mostly cumulative to what was already brought out during cross-examination of Martin. Further, Quintin's alleged confession would not exculpate Allen, because his confession would not negate the remainder of Quintin's testimony that Allen was the mastermind behind restraining and strangling Wright, and that both Allen and Quintin were present during and participated in the attack. We conclude that under these circumstances, there is no reasonable possibility that any error regarding this testimony affected the verdict in this case. See Williams v. State, 863 So. 2d 1189, 1190 (Fla. 2003) ("The question is whether there is a reasonable possibility that the error affected the verdict.") (quoting DiGuilio, 491 So. 2d at 1139).

Allen cites Chambers v. Mississippi, 410 U.S. 284 (1973), to argue that the trial court's failure to admit Quintin's alleged confession based on this statute is a violation of due process, but this case is inapposite. Here, the trial court did not

- 17 -

prevent Allen from calling or cross-examining Quintin as a witness.  Cf.

Chambers, 410 U.S. at 294 (a Mississippi common law rule that a party could not

impeach his own witness prevented the defendant from cross-examining the

witness about his prior confession to the murder in addition to the defendant being

prohibit from calling several witnesses who would have testified that McDonald

confessed); see generally McWatters, 36 So. 3d at 639 n.8 ("Because the cases are

not factually or procedurally similar and Chambers was expressly limited to its

facts, McWatters has failed to establish a due process violation."); § 90.804(2)(c),

Fla. Stat. (2005) (requiring that for admissibility of statements against penal

interests offered to exculpate the accused there must be sufficient corroborating

circumstances to show the trustworthiness of the statement).

Allen's alternative suggestion that the statement was admissible as an

admission of a party opponent or a co-conspirator's statement is unpreserved and

without merit.  See § 90.803(18)(e), Fla. Stat. (2005).  " 'In order to preserve an

issue for appellate review, the specific legal argument or ground upon which it is

based must be presented to the trial court.' "  Bertolotti v. Dugger, 514 So. 2d

1095, 1096 (Fla. 1987) (quoting Tillman v. State, 471 So. 2d 32 (Fla. 1985)); see

also Doorbal v. State, 983 So. 2d 464, 492 (Fla. 2008) ("For an issue to be

preserved for appeal, it must be presented to the lower court, and the specific legal

argument or ground to be argued on appeal must be part of that presentation.").

- 18 -

After the State objected to the admissibility of the subject statement, Allen argued that the statement could be admitted as a statement against interest. Allen now claims that this statement could have been admitted as an admission of a party opponent or a co-conspirator's statement. Thus, this argument is not preserved for review, and Allen must demonstrate that the error, if any, was fundamental, which it was not. Fundamental error is "defined as error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Anderson v. State, 841 So. 2d 390, 403 (Fla. 2003).

Even if this argument had been preserved, the claim is without merit. In order to be admitted as an admission of a party, the statement must be made while the conspiracy is in existence and before it is terminated. See Calvert v. State, 730 So. 2d 316, 319 (Fla. 5th DCA 1999) (noting that statements made after conspiracy had ended were inadmissible under section 90.803(18)(e)); see also Brooks v. State, 787 So. 2d 765, 772 (Fla. 2001). Even assuming the existence of a conspiracy between Allen and Quintin could be proven by a preponderance of the evidence and independent of the hearsay statement at issue, see Foster v. State, 778 So. 2d 906, 915 (Fla. 2000), any statement allegedly made by Quintin to Martin while they were incarcerated does not meet the admission requirements of section

- 19 -

90.803(18)(e), because it was not made while the conspiracy was in existence.  See

Brooks, 787 So. 2d at 772.

## II. Sufficiency of the Evidence

Allen asserts that the trial court erred in adjudicating Allen guilty of

kidnapping, and as a result the trial court erred in adjudicating Allen guilty of first-

degree felony murder predicated upon the kidnapping conviction.  We have a

mandatory obligation to review the sufficiency of the evidence in every case in

which a sentence of death has been imposed.  See Miller v. State, 42 So. 3d 204,

227 (Fla. 2010), cert. denied, 131 S. Ct. 935 (2011); Jones v. State, 963 So. 2d 180,

184 (Fla. 2007).  " 'In determining the sufficiency of the evidence, the question is

whether, after viewing the evidence in the light most favorable to the State, a

rational trier of fact could have found the existence of the elements of the crime

beyond a reasonable doubt.' "  Miller, 42 So. 3d at 227 (quoting Bradley v.

State, 787 So. 2d 732, 738 (Fla. 2001)).

The State charged Allen with first-degree felony murder during the course of

a kidnapping, and kidnapping with the intent to inflict bodily harm or terrorize the

victim.  See §§ 782.04 (1)(a)2.f.; 787.01(1)(a)3., Fla. Stat. (2005).  First-degree

felony murder is "[t]he unlawful killing of a human being: [w]hen committed by a

person engaged in the perpetration of, or in the attempt to perpetrate, a

- 20 -

kidnapping . . . "  § 782.04(1)(a)2.f., Fla. Stat. (2005).  Section 787.01(1)(a),

Florida Statutes (2005), defines kidnapping as the follows:

> The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
> 1.  Hold for ransom or reward or as a shield or hostage.
> 2.  Commit or facilitate commission of any felony.
> 3.  Inflict bodily harm upon or to terrorize the victim or another person.
> 4.  Interfere with the performance of any governmental or political function.

There is sufficient evidence to support the kidnapping conviction in this

case.  The evidence supports a finding that Wright was confined by force against

her will from the moment Wright tried to leave and Allen hit her on the head and

knocked her to the ground, with the intent to terrorize Wright in an attempt to

locate Allen's purse.  Quintin testified that Wright dropped down on her knees and

started crying and begged, "Margaret, please let me go home.  All I want to do is

go home to see my kids."  When Wright tried to leave, Allen hit her in the head

and continued punching her after Wright fell to the floor.  The events occurred

over a substantial period of time, during which Wright was beaten with fists and

belts and had caustic substances poured over her face.  Wright's legs were tied

with a belt so that she could not move.  The medical examiner, Dr. Qaiser, testified

that ligature marks were found on Wright's neck and wrists, supporting a

conclusion that she was either hung or something was tied tightly around her neck,

- 21 -

and her body was bruised. Thus, there is sufficient evidence to support the conviction of kidnapping with the intent to "inflict bodily harm upon or to terrorize the victim or another person," and that the kidnapping was not merely incidental to the killing. See §787.01(1)(a)3., Fla. Stat. (2005).

Allen heavily relies on our decision in <u>Faison</u> and several other cases for the proposition that we must determine whether the kidnapping was sufficiently separate from other criminal charges. See <u>Faison v. State</u>, 426 So. 2d 963, 965-66 (Fla. 1983); <u>Berry v. State</u>, 668 So. 2d 967, 969 (Fla. 1996); <u>Mobley v. State</u>, 409 So. 2d 1031, 1034 (Fla. 1982); <u>Sanders v. State</u>, 905 So. 2d 271, 272 (Fla. 2d DCA 2005); <u>Mackerley v. State</u>, 754 So. 2d 132, 137 (Fla. 4th DCA 2000).

In <u>Faison</u>, the following test was applied when a defendant was charged with two crimes, one of which was kidnapping under section 787.01(a)(2), "if a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement":

> (a) Must not be slight, inconsequential and merely incidental to the other crime;
> (b) Must not be of the kind inherent in the nature of the other crime; and
> (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

<u>Faison</u>, 426 So. 2d at 965. The decision in <u>Faison</u> is limited to kidnapping under section 787.01(a)(2). When a defendant is charged with confining, abducting or

imprisoning with the intent to "inflict bodily harm upon or to terrorize" under section 787.01(1)(a)3., Faison, has no application. Kopsho v. State, 84 So. 3d 204, 218 (Fla.), cert. denied, 133 S. Ct. 190 (2012) (citing Boyd v. State, 910 So. 2d 167, 184 (Fla. 2005)). Thus, Faison and the other cases to which Allen cites are inapposite. Additionally, as provided by the facts above, the kidnapping was not merely incidental to the killing, but was sufficiently separate from the murder. Thus, even if Faison was applicable, which it is not, the events would pass the Faison test.

Dr. Qaiser testified that Wright died as a result of homicidal violence, with strangulation and ligature important causes of her death. Quintin testified that Wright died as a result of the strangulation from the belt, during the event in which she was beaten and tied up by Allen and Quintin. Thus, Wright's death was directly related to her being a victim of kidnapping by Allen. Accordingly, there is sufficient evidence to support the conviction of felony murder with the underlying felony of kidnapping. Therefore, we conclude that there was sufficient evidence to support Allen's convictions.

## Penalty Phase Claims

## I. Prosecutorial Misconduct

Allen asserts that reversible error occurred when the prosecutor repeatedly asked Allen's mental health expert about the future dangerousness of Allen. On

- 23 -

cross-examination of the defense's mental health expert, Dr. Wu, who had testified

on direct examination that Allen's brain damage led her to have a lack of impulse

control, the following colloquy took place between Dr. Wu and the State:

Q [State]: Isn't it true, Doctor, that if somebody has impulse control, it just doesn't happen at random, it happens, I believe as you say, that they have a disproportionate overreaction to provocation, correct?

A [Dr. Wu]: That can occur. It doesn't necessarily have to occur on every occasion. It is something that can occur. She has a higher likelihood of this. It's kind of like saying how Toyota was, it was a problem with unattended acceleration, you are not going to have unattended acceleration all the time.

Q: So, she can control when it happens?

A: No. It's kind of like the driver of the car with unattended acceleration, he cannot control when it starts to go out of control. I mean, it may not happen for years and then all of a sudden it happens.

Q: So, it would happen, say, to a prison guard in the future, correct?

A: Well, I can't really say. All I can see is, that is something that I cannot really say. I mean, I would say she is at higher risk. But generally in a much more structured setting than the outside world. And people with brain injury in the frontal lobe usually do better in highly structured organized regimented systems.

Q: Okay. So, to your knowledge it never happened before this murder and you cannot say it is ever going to happen in the future. But you are saying because she committed a murder this one time that that is conclusive evidence that she has impulse control problems?

A: I am saying that the PET scan and the history is consistent with that of an individual who has a greater vulnerability of having problems with impulse control within a reasonable degree of medical probability.

Q: Okay. So, you are saying to a reasonable degree of medical probability she is a risk to any prison guard who is watching her in the future?

[Defense]: Objection. Speculation.

[Court]: Sustained.

First, Allen's argument on appeal that the State improperly commented on the future dangerousness of Allen was not preserved for review. " 'In order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court.' " Bertolotti, 514 So. 2d at 1096 (quoting Tillman, 471 So. 2d at 35). Additionally, when the trial court has sustained a defendant's objection, it is further necessary for a defendant to move for a mistrial to preserve an issue for appeal, which did not occur at trial in this case. Ed Ricke & Sons, Inc. v. Green By and Through Swan, 468 So. 2d 908, 910 (Fla. 1985); see generally Walker v. State, 707 So. 2d 300, 314 n.8 (Fla. 1997) ("So long as the defendant makes a timely specific objection and moves for a mistrial, as Walker did here, a curative instruction need not be requested."). The first question by the State to Dr. Wu on cross-examination regarding the possibility of future dangerousness was asked and answered without objection. When Allen objected after the State asked the question a second time, the defense based the objection on speculation. However, Allen did not argue that the State was impermissibly attempting to elicit testimonial evidence assessing Allen's likely future dangerousness. When the trial court sustained the objection on the basis of

- 25 -

speculation, Allen did not move for a mistrial or any other further relief. Thus, this issue is not preserved for review, and Allen must demonstrate that the error was fundamental to be entitled to relief. In the penalty phase, fundamental error must be so prejudicial as to taint the jury's recommended sentence. See Fennie v. State, 855 So. 2d 597, 609 (Fla. 2003).

We have held that arguments of future dangerousness as a basis to impose a death sentence are improper and "prosecutorial overkill." Teffeteller v. State, 439 So. 2d 840, 844 (Fla. 1983) (reversing based on prosecutor's improper and inflammatory remarks during closing argument where prosecutor repeatedly stated that if the defendant did not receive the death penalty he would be paroled in twenty-five years and would kill again). " '[T]he probability of recurring violent acts by the defendant . . . ' is not a proper aggravating circumstance in Florida." Walker, 707 So. 2d at 314. "Moreover, the State may not attach aggravating labels to factors that actually should militate in favor of a lesser penalty—like, as in this case, the defendant's mental impairment." Id. (citing Zant v. Stephens, 462 U.S. 862, 885 (1983)).

On cross-examination of Dr. Wu, the prosecutor clearly attempted to elicit improper testimony about the possible future dangerousness of Allen. Both of the State's assertions, that the defense opened the door to this line of questioning by asking Dr. Wu if Allen's lack of impulse control could occur at any time, and that

- 26 -

the State's questions were not to show future dangerousness but to discredit Dr. Wu's opinion that she lacked impulse control, are disingenuous. It is clear that the State was attempting to improperly allege Allen's future dangerousness, without a valid basis.

Nonetheless, we determine that the prosecutor's improper questions to Dr. Wu here were less egregious than those warranting reversal when the issue was preserved. See Kormondy v. State, 703 So. 2d 454, 461-62 (Fla. 1997) (finding that over defense objection the prosecutor introduced testimony that defendant threatened to kill witnesses if he could get out of jail was not harmless error); Teffeteller, 439 So. 2d at 844-45 (reversing where prosecutor repeated over and over during closing argument that if the defendant did not receive the death penalty he would be paroled in twenty-five years and would kill again). This reference to Allen's future dangerousness only occurred two times in an isolated portion of the penalty phase, and the prosecutor did not again imply that Allen would be dangerous in the future during the remainder of the cross-examination. Furthermore, Allen's future dangerousness was neither argued by the State in its closing argument nor relied upon in the trial court's sentencing order. Lastly, the trial court instructed the jury on the proper aggravating circumstances. Thus, these two questions by the State did not deprive Allen of a fundamentally fair penalty phase trial so as to necessitate a new penalty phase. See generally Walker, 707 So.

2d at 314 (finding that although it was wholly improper for the prosecutor to ask whether Walker may kill again, the question was isolated, and the trial court properly instructed the jurors as to the aggravating facts they could consider; therefore, the error was harmless beyond a reasonable doubt).

## II. Aggravating Circumstances

Allen asserts that the trial court erred in finding the aggravating circumstances (a) that the capital felony was committed during the commission of a kidnapping, and (b) that the capital felony was especially heinous, atrocious, or cruel (HAC). In reviewing the trial court's finding of an aggravating circumstance, this Court's "task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." McWatters, 36 So. 3d at 641 (quoting Lynch v. State, 841 So. 2d 362, 268 (Fla. 2003)).

### a. During the Course of a Kidnapping

Allen asserts that the trial court erred in finding the aggravating circumstance that the capital felony was committed while the defendant was engaged in the commission of a kidnapping. See § 921.141(5)(d), Fla. Stat. (2005). Allen bases this assertion on her argument that the trial court erred in adjudicating Allen guilty of kidnapping. As discussed above, the evidence is sufficient to support Allen's kidnapping conviction. Thus, the trial court's finding

during the penalty phase that the evidence supports the aggravating circumstance that the murder was committed during the course of a kidnapping is supported by competent, substantial evidence.  See, e.g., Hess v. State, 794 So. 2d 1249, 1263 n.16 (Fla. 2001) (rejecting appellant's challenge to the trial court's finding that the murder was committed during the commission of a robbery as an additional aggravating factor where this Court found sufficient evidence to support the felony murder conviction based on robbery).

### b.  HAC

Allen asserts that the trial court erred in finding the aggravating circumstance of HAC.  See § 921.141 (5)(h), Fla. Stat. (2005).  The HAC aggravator is proper "only in torturous murders—those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another."  Guzman v. State, 721 So. 2d 1155, 1159 (Fla. 1998) (citing Kearse v. State, 662 So. 2d 677 (Fla. 1995)).  The HAC aggravator does not focus on the intent and motivation of the defendant, but on the "means and manner in which death is inflicted and the immediate circumstances surrounding the death."  Brown v. State, 721 So. 2d 274, 277 (Fla. 1998) (citing Stano v. State, 460 So. 2d 890, 893 (Fla. 1984)).  In Patrick, we recently reiterated our long held view on when the HAC aggravating

circumstance should be upheld in cases where the victim had been beaten during the commission of the murder and the sentence of death has been imposed:

> [This Court has] upheld the HAC aggravator in numerous cases involving beatings. Lawrence v. State, 698 So. 2d 1219, 1221–22 (Fla. 1997) ("We have consistently upheld HAC in beating deaths."); see also, e.g., Colina v. State, 634 So. 2d 1077, 1081 (Fla. 1994) (holding that the HAC aggravator applied where one of the defendants hit the victim, who fell to the ground, and when that victim attempted to get to his feet, the other defendant hit him several times in the back of the head with a tire iron); Owen v. State, 596 So. 2d 985, 990 (Fla. 1992) (upholding the HAC aggravator where the sleeping victim was struck on the head and face with five hammer blows); Lamb v. State, 532 So. 2d 1051, 1053 (Fla. 1988) (upholding the HAC aggravator where the defendant struck the victim six times in the head with a claw hammer, pulled his feet out from under him, and kicked him in the face); Heiney v. State, 447 So. 2d 210, 216 (Fla. 1984) (upholding the HAC aggravator where seven severe hammer blows were inflicted on the victim's head).

Patrick v. State, 104 So. 3d 1046, 1066-67 (Fla. 2012) (quoting Buzia v. State, 926 So. 2d 1203, 1212 (Fla. 2006)), petition for cert. filed, No. 12-10148 (U.S. May 1, 2013). We have also upheld the HAC aggravator in cases involving strangulation during which the victim was conscious. See Mansfield v. State, 758 So. 2d 636, 645 (Fla. 2000) (noting the medical examiner testified that the victim "was conscious during the strangulation and beating, and suffered pain therefrom in a desperate struggle to breathe for at least a few minutes"; although she could not pinpoint exactly how long the victim experienced pain, "her testimony made clear that [the victim] was conscious for 'more than a few minutes.' ").

Wright was terrorized over a substantial period of time and she was aware of what was happening to her. Testimony reflects that Wright begged to be let go. When she tried to leave, Allen punched her in the head; Wright fell on the ground, and Allen continued punching her. According to Quintin, he was holding Wright down while Allen poured chemicals onto Wright's face. Allen beat Wright with belts while Wright's legs were tied. Allen then strangled Wright with a belt. Quintin testified that Wright was terrified and screamed for Allen to stop because she was going to wet herself. Wright was shaking and moving around for about three minutes after the belt was placed around her neck.

According to Dr. Qaiser, the cause of death was strangulation. Dr. Qaiser also testified that he found bruises and contusions on Wright's body which indicated that she was beaten. In particular, bruises were found on the back of the ear, forehead, left side of the torso, trunk and the leg area. He also found ligature marks over Wright's wrist and neck, which indicated that she was tied and strangled. He explained that if someone suffers a blow to the head and becomes unconscious, consciousness could be regained thereafter. According to Dr. Qaiser, it could take a person four to six minutes to die as a result of strangulation, and aperson could remain conscious during about ten to twenty seconds of that time.

Allen contends that Wright could have lost consciousness upon the initial blow to her head and therefore been unaware of her impending death, asserting that

there were no defensive wounds. This assertion is negated by Quintin's testimony that Wright was conscious and continually pleaded to be released and that upon being strangled, Wright pleaded for Allen to stop, stating that she might wet her pants. While Allen points to the medical examiner's testimony that he could not tell when Wright lost consciousness or how much pain she suffered before she died, Quintin's eyewitness testimony that Wright was conscious and pleading to be let go supports a finding that she was conscious and aware of her impending death. Furthermore, we have often upheld a finding of HAC when the victim has defensive wounds, but the mere absence of defensive wounds alone does not in and of itself preclude a finding of HAC. See, e.g., Russ v. State, 73 So. 3d 178, 197 (Fla. 2011) ("[B]ased on the evidence, common sense indicates that the absence of defensive wounds on [the victim's] body resulted from either her cooperation or being bound prior to being murdered—it does not, as [the defendant] contends, preclude a finding of HAC."); Zommer v. State, 31 So. 3d 733, 747 (Fla. 2010) ("[T]he lack of defensive wounds on the body of the victim has not precluded this Court from holding the HAC aggravator applicable."). Accordingly, the trial court did not err in finding the HAC aggravator.

### III. Mitigation

Allen raises several issues regarding mitigation. Specifically, she asserts that (a) the trial court erred in rejecting the statutory mental mitigators of (i) the

- 32 -

capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance and (ii) the capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired; and (b) the trial court erred in the weight it assigned to the nonstatutory mitigation.

### a. Statutory Mental Mitigation

Allen contends that the trial court erred in rejecting the following statutory mitigators: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) the capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired. See §§ 921.141 (6)(b), 921.141 (6)(f), Fla. Stats. (2005).

We recently reiterated the requirements regarding mitigation.

> A trial court must expressly evaluate all statutory and nonstatutory mitigators a defendant has proposed. See Ault v. State, 53 So. 3d 175, 186 (Fla. 2010), cert. denied, 132 S.Ct. 224 (2011). A trial court must find a proposed mitigating circumstance when the defendant has established that mitigator through competent, substantial evidence. See Reynolds v. State, 934 So. 2d 1128, 1159 (Fla. 2006). However, a trial court may reject a mitigator if the defendant fails to prove the mitigating circumstance, or if the record contains competent, substantial evidence supporting that rejection. See Ault, 53 So. 3d at 186. "Even expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case." Id. (quoting Coday v. State, 946 So. 2d 988, 1003 (Fla. 2006)). A mitigator may also be rejected if the testimony supporting it is not substantiated by the actions of the defendant, or if the

testimony supporting it conflicts with other evidence. See Douglas v. State, 878 So. 2d 1246, 1257 (Fla. 2004) (holding that although testimony supported a mitigator, the trial court did not err by not finding it because the actions of the defendant did not substantiate that testimony); see also Coday, 946 So. 2d at 1005 ("The expert testimony from the defense could be rejected only if it did not square with other evidence in the case.").

Oyola v. State, 99 So. 3d 431, 444-45 (Fla. 2012).

### i. The Capital Felony was Committed While the Defendant was Under the Influence of Extreme Mental or Emotional Disturbance

Allen contends that the trial court erred in rejecting the statutory mitigator of the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. See § 921.141(6)(b), Fla. Stat. (2005). Allen's assertion that the trial court improperly focused on whether the crime was committed while Allen was abusing drugs or alcohol appears to be correct. Nevertheless, we find the trial court's incorrect analysis harmless beyond a reasonable doubt. See DiGuilio, 491 So. 2d at 1135; Heyne v. State, 88 So. 3d 113, 123 (Fla.), cert. denied, 133 S. Ct. 113 (2012). While Allen insists that evidence of brain damage showed that she was under an extreme mental or emotional disturbance at the time of the murder, neither of her expert witnesses so testified. In fact, neither of her experts was asked if he had an opinion about this mitigator. Given the total lack of evidence supporting this mitigator, the trial court's rejection of this mitigator is supported by competent substantial evidence in the record.

**ii. The Capacity of the Defendant to Appreciate the Criminality of His or Her Conduct or to Conform His or Her Conduct to the Requirements of Law was Substantially Impaired**

Allen contends that the trial court erred in rejecting the statutory mitigator that her capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was substantially impaired. See § 921.141(6)(f), Fla. Stat. (2005). "Mitigating evidence must be considered and weighed when contained 'anywhere in the record, to the extent it is believable and uncontroverted.' " LaMarca v. State, 785 So. 2d 1209, 1215 (Fla. 2001) (quoting Robinson v. State, 684 So. 2d 175, 177 (Fla. 1996)). "However, a trial court may reject a mitigator if the defendant fails to prove the mitigating circumstance, or if the record contains competent, substantial evidence supporting its rejection." Oyola, 99 So. 3d at 445 (citing Ault, 53 So. 3d at 186). When expert opinion evidence is presented, it "may be rejected if that evidence cannot be reconciled with other evidence in the case." Id. In Foster v. State, 679 So. 2d 747, 755 (Fla. 1996), this Court stated that "[e]ven uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence in the case." Accord Coday v. State, 946 So. 2d 988, 1005 (Fla. 2006).

The trial court's rejection of this mitigator is supported by competent, substantial evidence. During the penalty phase, two experts, Drs. Gebel and Wu, testified on behalf of the defense. Dr. Gebel testified that he had reviewed Allen's

records and spoke with Allen. He determined that Allen suffered from numerous head injuries, including at least four incidents in which Allen lost consciousness. He testified that Allen's records included emergency room visits in 1995 and 1996 during which she was treated for facial and head trauma and bite wounds. He also testified that she was treated in 1989 for a drug overdose. Dr. Gebel opined that Allen had significant intracranial injuries and was at the lower end of intellectual capacity. He testified that Allen had organic brain damage, which would destroy impulse control. He testified that this brain damage "might" affect her ability to appreciate the criminality of her conduct and that she would have difficulty conforming her conduct to the requirements of the law. He also testified that Allen would not be able to create a complex plan. He testified that Allen was not cooperative enough for him to determine whether Allen was substantially mentally impaired, but that she had lost the ability to control her mood. On cross-examination, the State elicited Dr. Gebel's opinion that a person with her injuries would not be able to create and follow through with a plan such as the one Allen executed to discard Wright's body. Upon Dr. Gebel learning of the underlying facts of Allen's crimes and subsequent actions to hide the crime, he stated that while they would change the severity of his diagnosis regarding Allen, they would not change the injuries she had sustained.

Dr. Wu testified that he reviewed Allen's PET scan. He testified that Allen had at least ten traumatic brain injuries, mostly to the right side of her brain, resulting in asymmetrical changes, specifically in the frontal lobe. Dr. Wu testified that damage to the frontal lobe affects impulse control, judgment, and mood regulation. He testified that she would have an overreaction to slight provocation. He testified that Allen's ability to appreciate the criminality of her conduct would be impaired. He also testified that Allen's injuries should not impair her planning abilities. Dr. Wu testified that Allen's ability to understand and regulate proportionate responses in a consistent manner is significantly impaired. He also testified that it would be difficult for her to consistently conform her conduct to the requirements of society.

Neither of these experts testified that Allen's health condition substantially impaired her ability to conform her conduct to the requirements of law, as mandated in the express language of section 921.141(6)(f). See Oyola, 99 So. 3d at 445. Dr. Gebel testified that Allen was not cooperative enough for him to determine whether she was significantly mentally impaired. Dr. Gebel testified that Allen's brain damage might affect her ability to appreciate the criminality of her conduct and that she would have difficulty conforming her conduct to the requirements of the law. Dr. Wu also testified that Allen's brain injuries would make it hard for Allen to consistently conform her conduct to the requirements of

society.  The experts contradicted one another regarding their opinions of Allen's planning capabilities, with Dr. Gebel testifying that Allen would not be able to plan and execute the actions that took place after Wright's death, and Dr. Wu testifying that her brain injuries would not affect her planning abilities.  Their testimonies were also inconsistent regarding whether Allen's ability to appreciate the criminality of her conduct was impaired.

Furthermore, the evidence presented supports the rejection of the theory that Allen's mental condition substantially impaired her ability to conform her conduct to the requirements of the law.  Specifically, the events surrounding Wright's death lasted for an extensive period of time rather than an instantaneous moment of loss of impulse control.  Allen kept Wright at her house long enough to search for her purse at Wright's house, return, get her hair plaited by Quintin, then tie Wright up, beat her with her fists and a belt, and pour caustic substances on Wright's face before finally strangling her to death with a belt.  The evidence presented also established that Allen understood the criminality of her conduct and was intelligent enough to destroy evidence in an attempt to exculpate herself from the murder; i.e., she went to Dublin's house asking if he had seen Wright and suggesting that she did not know that Wright was at her house; she went to Lowe's and bought plywood and borrowed a dolly to help load Wright's body into the truck; she took Wright's body to a covert location and directed Quintin and Martin to bury it while

she stood as a lookout; and she disposed of the rug that had been used to wrap up Wright's body in a dumpster. Given Allen's actions during the killing and afterwards in an attempt to hide the evidence, a reasonable judge could have rejected the statutory mitigator at issue. See Oyola, 99 So. 3d at 445 (finding the trial court did not err in rejecting the statutory mental mitigator where evidence showed that Oyola understood the criminality of his conduct and was intelligent enough to destroy evidence in an attempt to exculpate himself from the murder); Nelson v. State, 850 So. 2d 514, 531 (Fla. 2003) (finding competent, substantial evidence refuting the allegation that Nelson lacked the capacity to appreciate the criminality of his acts or to conform to the requirements of law where evidence was presented that Nelson knew his actions were wrong and could conform his conduct to the law if he so desired). Allen asserts that Martin recounted in his testimony that Quintin may have orchestrated the disposal of the body, and that Quintin may have killed Wright. However, most of Quintin and Allen's testimonies assert that Allen was the director of the crimes and subsequent plans to cover up their crimes.

### b. Weight Assigned to Nonstatutory Mitigation

Allen asserts that the trial court erred in the weight it assigned to the nonstatutory mental mitigation. The weight a trial court assigns to a mitigator is

within its discretion and will not be disturbed on appeal absent an abuse of that discretion. See Douglas v. State, 878 So. 2d 1246, 1257 (Fla. 2004).

The trial court found the following nonstatutory mitigation: (1) defendant has been the victim of physical abuse and possible sexual abuse in the past (some weight); (2) defendant has brain damage as a result of prior acts of physical abuse and the brain damage results in episodes of lack of impulse control (some weight); (3) defendant grew up in a neighborhood where there were acts of violence and illegal drugs (some weight); and (4) defendant would help other people by providing shelter, food or money (little weight).

The trial court did not abuse its discretion in its assignment of weight to the nonstatutory mitigators. The trial court considered each of the mitigating circumstances presented by Allen, and the trial court provided detailed factual findings as to the reasons or circumstances upon which it based its evaluation of each mitigating circumstance. All of the trial court's findings are clearly supported by the record. Although the above mitigators were established, their effect, given the facts of this case, warranted the allocation of "some weight" and "little weight."

Allen also asserts that the trial court's sentencing order fails to meet the standard set forth in Campbell v. State, 571 So. 2d 415 (Fla. 1990), by rejecting the statutory mitigating circumstances and applying too little weight to the

nonstatutory mitigating circumstances without proper explanation. In <u>Campbell</u>, this Court provided guidelines to clarify the requirements of a trial court addressing the aggravating and mitigating factors in its capital sentencing order:

> When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature . . . . The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance. Although the relative weight given each mitigating factor is within the province of the sentencing court, a mitigating factor once found cannot be dismissed as having no weight. To be sustained, the trial court's final decision in the weighing process must be supported by "sufficient competent evidence in the record." <u>Brown v. Wainwright</u>, 392 So. 2d 1327, 1331 (Fla. 1981).

571 So. 2d at 419-20, <u>receded from in part by</u> <u>Trease v. State</u>, 768 So. 2d 1050, 1055 (Fla. 2000) (receding from <u>Campbell</u> to the extent that it disallowed trial courts from according no weight to a mitigating factor) (footnote omitted). In <u>Ferrell</u>, this Court stated, "The result of this weighing process must be detailed in the written sentencing order and supported by sufficient competent evidence in the record. The absence of any of the enumerated requirements deprives this Court of the opportunity for meaningful review." <u>Ferrell v. State</u>, 653 So. 2d 367, 371 (Fla. 1995).

Review of the sentencing order shows that Allen's assertion is without merit. The trial court identified each mitigating circumstance presented by the defense

and stated its conclusion as to each mitigator, supplying facts and reasoning for its conclusions. The trial court adequately reviewed each of the proposed aggravators and mitigators and applied the relevant facts of the case to each. The trial court gave careful consideration to the aggravating and mitigating circumstances, carefully weighed them, and found that the aggravation outweighed the mitigation. Allen's reliance on Hudson v. State, 708 So. 2d 256, 260 (Fla. 1998), is misplaced. Unlike here, in Hudson, the trial court provided a summary analysis of statutory and nonstatutory factors without evaluating the evidence presented. Id. at 258 ("Unfortunately, the trial court's order on this resentencing is so lacking in detail that we cannot decide the proportionality issue."). Such is not the case here.

### c. Proportionality

Allen contends that the death sentence imposed in her case is not proportional. "[T]o ensure uniformity in death penalty proceedings, 'we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.' " Floyd v. State, 913 So. 2d 564, 578 (Fla. 2005) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). This Court has described its "proportionality review" as involving "a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases." Tillman v.

State, 591 So. 2d 167, 169 (Fla. 1991) (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990) (emphasis omitted)). "This entails 'a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' In other words, proportionality review 'is not a comparison between the number of aggravating and mitigating circumstances.' " Offord v. State, 959 So. 2d 187, 191 (Fla. 2007) (citations omitted).

Allen was convicted of the first-degree murder of Wenda Wright and kidnapping. The trial court found the following aggravators: (1) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit a kidnapping (great weight); and (2) the capital felony was especially heinous, atrocious, or cruel (great weight). The trial court found no statutory mitigation, and found the following nonstatutory mitigation: (1) defendant has been the victim of physical abuse and possible sexual abuse in the past (some weight); (2) defendant has brain damage as a result of prior acts of physical abuse and the brain damage results in episodes of lack of impulse control (some weight); (3) defendant grew up in a neighborhood where there were acts of violence and illegal drugs (some weight); and (4) defendant would help other people by providing shelter, food or money (little weight). The jury recommended a sentence of death by a unanimous vote of 12-0.

We find that the death sentence is proportional in this case. See Sliney v. State, 699 So. 2d 662, 667 (Fla. 1997) (death sentence proportional where the trial court gave great weight to two aggravators—committed during course of felony and for purpose of avoiding lawful arrest—and statutory mitigators of (1) youthful age (little weight), and (2) no significant prior criminal history; nonstatutory mitigators: (1) his politeness; (2) good neighbor; (3) caring person; (4) good school record; and (5) gainful employment); see also Mansfield v. State, 758 So. 2d 636, 646-47 (Fla. 2000) (affirming death sentence with aggravators: (1) HAC; and (2) during the commission of or an attempt to commit sexual battery; no statutory mitigation and five nonstatutory mitigators and found the following three mitigators entitled to very little weight: (1) good conduct during trial; (2) alcoholic; and (3) the defendant's mother was an alcoholic during his childhood. The court accorded the remaining two mitigators some weight: (1) the defendant had a poor upbringing and dysfunctional family; and (2) the defendant suffers from a brain injury due to head trauma and alcoholism.); Blackwood v. State, 777 So. 2d 399, 412 (Fla. 2000) (finding death sentence proportional where trial court found aggravating factor of HAC, statutory mitigating factor of no significant history of prior criminal conduct, and numerous nonstatutory mitigating factors, including emotional disturbance at the time of the crime).

## CONCLUSION

Based on the foregoing, we affirm Allen's convictions of kidnapping and first-degree murder and respective sentences of life imprisonment and death.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Brevard County,
George W. Maxwell, III Judge - Case No. 2005-CF-48260-A

James S. Purdy, Public Defender, and James R. Wulchak, Assistant Public Defender, Daytona Beach, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Tamara Milosevic, Assistant Attorney General, Miami, Florida,

for Appellee